Peter J. MALLEN, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, d/b/a Merrill Lynch Futures, Inc., f/k/a Merrill Lynch Commodities, Inc., and Robert P. Spanos, Defendants.

Civ. A. No. C 83–1786 A.

United States District Court, N.D. Georgia, Atlanta Division.

March 27, 1985.

See also, D.C., 102 F.R.D. 801.

**26.** Defendant's Exhibit EE.

**27.** Record at 1133.

Gilbert Deitch and Gerald Kline, Bauer, Deitch & Raines, P.C., Atlanta, Ga., for plaintiff.

Paul W. Stivers and Robert Axelrod, Rogers & Hardin, Atlanta, Ga., for defendants.

## ORDER

VINING, District Judge.

The plaintiff, Peter Mallen, opened an account on March 3, 1983, with Merrill Lynch Futures, Inc., which was formerly known as Merrill Lynch Commodities, Inc. The corporate defendant will be hereinafter referred to as "Merrill Lynch." Mr. Mallen's original account executive was William Knochel. In the first month that the account was open, the plaintiff bought and sold futures in gold and silver. All account activity was in traditional commodity futures at the plaintiff's direction. The plaintiff alleges that in April of 1983, he was approached by another Merrill Lynch account executive, Robert Spanos. Mallen authorized this second account executive to purchase and sell commodity futures in Mallen's name without limitation. Beginning in May 1983, the account activity, accordingly, became a newer and riskier form of speculation, with Spanos buying

and selling contracts for future delivery based not on traditional commodities such as gold and silver but on two stock indices, the K.C. Value Line and the Standard and Poor 500 Index. By the end of May the account showed a loss of $28,000. The plaintiff alleges that he told Spanos to liquidate the account at that point, but Spanos convinced him to maintain "straddle" positions as insurance. The plaintiff acquiesced for several weeks. When the plaintiff finally closed the account at the end of May, his year-to-date losses had grown to more than $60,000.

In August 1983, the plaintiff filed a complaint with seven counts based on violations of federal securities laws, state securities laws, and on several common law theories as follow: Count I, section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder; Count II, section 17 of the Securities Act of 1933; Count III, section 12(2) of the Securities Act of 1933; Count IV, the Georgia Securities Act, O.C.G.A. § 10–5–1 *et seq.;* Count V, common law fraud; Count VI, common law breach of fiduciary duty; and Count VII, common law negligence.

On July 13, 1984, the defendants moved to dismiss the first four counts of the complaint on the ground that the application of the federal and state securities laws to Mallen's account has been precluded and preempted by the operation of the Commodity Exchange Act. The defendants argue that transactions in "stock index futures" are "commodities"; the plaintiff argues that the same transactions involve "securities."

The court will consider first whether the investment vehicles at issue in this case are "securities" and subject to the regulatory jurisdiction of the Securities and Exchange Commission (hereinafter the "SEC") or "commodities" and subject to the regulatory jurisdiction of the Commodity Futures Trading Commission (hereinafter the "CFTC"). The court will then consider the basis of its jurisdiction to hear this case.

■ 1. *Securities.* The SEC has regulatory authority over "securities." 15 U.S.C. § 77b(1); 15 U.S.C. § 78c(a)(10). The word "security" is used in those statutes to refer to a list of investments. The list includes the traditional form of stock in corporations but also includes the open-ended concept of an "investment contract." The phrase "investment contract" has been applied on a case-by-case basis to less traditional schemes when the schemes (1) involve an investment of money; (2) function as a "common enterprise;" and (3) derive profits solely from the efforts of individuals other than the investors. *See SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *SEC v. Glenn W. Turner Enterprises,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

2. *Commodities.* Commodities in the traditional sense were tangible things with inherent value for consumption or processing, such as coin, copper, and cattle. The sale of certain agricultural commodities on exchanges called "contract markets" has been subject to federal regulation longer than the sale of securities. Before the 1974 amendments to the commodities laws, the regulatory function was handled by the Department of Agriculture.

■ The shorthand term "commodity future" refers to a standardized contract for purchase and sale of a fixed quantity of a commodity of designated grade, for delivery in a specified future month, at a price agreed on when the contract is made. The individual contract for future delivery of a commodity has never been considered a "security." *SEC v. Continental Commodities Corp.,* 497 F.2d 516, 520 n. 9 (5th Cir.1974); *Sinva, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 253 F.Supp. 359, 366–67 (S.D.N.Y.1966).

3. *Discretionary Commodity Future Accounts.* Before the revamping of the commodities laws in 1974, 1978, and 1982, the regulatory jurisdiction of the SEC was stretched to reach certain scandals in the sale of futures for non-regulated commodities. While the underlying contract for future delivery of a commodity was not a

security regulated by the SEC, the accounts in which the futures contracts were traded were sometimes found to be "securities." Many courts held that when an investor granted authority to his broker to make purchases and sales of commodity futures contracts, the investor's reliance on his broker's efforts supplied the third element of the test for an "investment contract." The first element of investment of money was almost always present. Therefore, the treatment of a "discretionary commodity futures account" as an "investment contract," and consequently as a "security," depended on how strictly courts interpreted the second element. The requirement of a "common enterprise" has been variously satisfied in different circuits by the following:

    a. *Vertical Commonality.* In precedent that is binding on this court, the vertical relationship between the customer and broker was recognized as creating a "common enterprise" although there was no pooling with other customers' accounts. *SEC v. Continental Commodities Corp.,* 497 F.2d 516, 520–23 (5th Cir.1974).

    b. *Horizontal Commonality.* Other circuits took a stricter view, insisting on pooling of customers' accounts before the courts would find a "common enterprise." *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 622 F.2d 216, 224–25 (6th Cir.1980), *aff'd on other grounds,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972).

    c. *Vertical Commonality Plus Sharing of Profits.* Another circuit took the strictest view, requiring that the broker share in the enterprise apart from the payment of his commissions before the court would find a "common enterprise." *Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc.,* 686 F.2d 818 (9th Cir.1982), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 495 (1983). *See* L. Loss, *Fundamentals of Securities Regulation* 253–258 (1983) (herein-

after cited as Loss) (Professor Loss sets out in more detail the split among the circuits on the commonality requirement.)

While federal courts were expanding the jurisdiction of the SEC to deal with certain abuses in commodities trading, Congress took a different tack. In the 1970's there was growing dismay over rising food prices and devastating grain shortages. There was also a public perception that manipulation of trading in commodities futures had caused or exacerbated the economic problems. *See* Van Wart, *Preemption and the Commodity Exchange Act,* 58 Chi.-Kent L.Rev. 657, 672 (1982). Following extensive hearings, Congress enacted the Commodity Futures Trading Commission Act of 1974, which extensively amended the existing Commodity Exchange Act. 88 Stat. 1389 (1974). The act transferred commodity regulation from the Department of Agriculture to the newly created CFTC and, perhaps too broadly, expanded the concept of a commodity beyond the edible to the intangible. In a section of the 1974 act which was destined to create jurisdictional chaos, "commodity" was defined to include not only specific items such as peanuts and frozen concentrated orange juice but also the following:

    [A]ll services, rights, and interests in which contracts for future delivery are presently or in the future dealt in:

    *Provided,* That the CFTC shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option," "privilege," "indemnity," "bid," "offer," "put," "call," "advance guarantee," or "defined guarantee,") and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 7 of this title or any other board of trade, exchange or market . . . :

    *And provided further,* That except as hereinabove provided, nothing contained in this section shall

(i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or any State or

(ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2. [Spacing between the clauses supplied by the court.]

In the hearings on the proposed 1974 amendments, Congress was specifically asked to resolve whether the CFTC would have exclusive jurisdiction over discretionary commodity accounts, those managed by the broker rather than by the customer. 58 Chi.-Kent L.Rev. at 684–85. Congress subsequently gave the CFTC exclusive jurisdiction over "accounts … involving contracts of sale of a commodity for future delivery." Since the final version of the 1974 amendments did not distinguish between regular trading accounts and managed, or discretionary, accounts, several district courts held that the 1974 legislation placed sole regulatory control of discretionary commodity accounts under the CFTC. *See, e.g., Hofmayer v. Dean Witter & Co.,* 459 F.Supp. 733 (N.D.Cal.1978). *See also Westlake v. Abrams,* 504 F.Supp. 337, 344 (N.D.Ga.1980) (which agrees with *Hofmayer* on regulatory but not judicial jurisdiction).

It should be noted that statements in *SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir.1974) and *Moody v. Bache & Co.,* 570 F.2d 523 (5th Cir.1978), to the effect that a discretionary commodity account may be a "security" are no longer vital. The decision in *Continental Commodities* interpreted only the securities acts and concerned pending litigation which the recent amendments to the commodities act would not have reached. The decision in *Moody v. Bache & Co.* assumed *arguendo* that both the securities acts and com-

modities act could apply to a discretionary commodities account in deciding that the jury's finding that no causation existed under either theory precluded recovery. The court's citation of *Continental Commodities* in that hypothetical context does not indicate its continued vitality after the 1974 amendments.

■ The complaint describes Mr. Mallen's account as a "discretionary commodity futures account." The use of that label is misleading but understandable since Merrill Lynch's trading authorization forms and its computer reports of activity used that term generically. Mr. Mallen's account was originally a regular trading account with transactions in the traditional commodities described above. Such accounts have never been treated as "securities." When Mr. Mallen authorized his broker's speculation in "stock index futures," the account became "discretionary." For purposes of regulatory jurisdiction, the 1974 amendments made it clear that such a discretionary commodity account is now a "commodity" and not a "security." The individual transactions in the account, however, were in investment vehicles radically different from any traded in 1974.

4. *Stock Index Futures.* The 1974 expansion of the jurisdiction of the CFTC to futures contracts on intangible interests created an inevitable jurisdictional conflict with the SEC. The investment vehicle which would create the greatest jurisdictional problem would be a contract of sale for future delivery of broad-based stock indices, colloquially known as a "stock index future." The CFTC's new authority to regulate such investments was a direct incursion on the SEC's regulatory turf.

Following jurisdictional skirmishes caused by the broad language of the 1974 amendments, the two agencies announced an accord in December 1981. *SEC and CFTC Jurisdictional Agreement: Proposed Legislation,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 83,096 (Joint Explanatory Statement Feb. 2, 1982). One writer described this unique document as an "estimable example of administrative

harmony." *Loss* at 257. The agencies' jurisdictional treaty granted the CFTC exclusive jurisdiction over the trading of futures contracts on boards of trade and made the SEC the sole federal regulator of the securities options markets. In view of the SEC's strong regulatory concern with respect to the trading of futures on securities groups and indices, the two agencies worked out joint responsibility in the designation of contract markets for the trading of these new instruments. The CFTC would approve futures trading in a group or index of such securities subject to criteria specified by both agencies. For trading to be approved, the group or index of securities (1) had to be a widely published and accurate measure of a broad segment of the corporate or municipal securities markets, (2) could not be susceptible to manipulation of the underlying securities market or securities options market and (3) had to be settled by cash or by other means not involving the delivery of municipal securities or securities subject to the registration requirements of the federal securities laws. The CFTC would be required to consult with the SEC when determining that any contract market for futures contracts involving a securities group or index met these criteria. An SEC objection would be entitled to judicial review. In effect, there would be joint designation of boards of trade as contract markets for stock index futures followed by exclusive regulatory jurisdiction over the new investment vehicle in the CFTC. Meanwhile, the SEC would have exclusive regulatory authority with respect to options directly on underlying securities and securities groups or indices.

The efficacy of this unique jurisdictional treaty was questioned by a federal court in *Board of Trade of the City of Chicago v. SEC*, 677 F.2d 1137, 1142 n. 8 (7th Cir. 1982), prompting the agencies to submit to Congress proposed legislation in February 1982 which embodied the essence of the accord. The agencies' division of their jurisdiction was ratified by the enactment, with few changes, of the proposed amendments to the federal securities and com-

modities laws. *See* Pub.L. No. 97–303, 96 Stat. 1409 (1982), and the Futures Trading Act of 1982, Pub.L. No. 97–444, 96 Stat. 2295 (1983).

In ratifying the agencies' jurisdictional treaty, Congress amended the jurisdictional statute for the CFTC, 7 U.S.C. § 2 quoted extensively above, by inserting after the grant of exclusive jurisdiction to the CFTC, the phrase "except to the extent otherwise provided in section 2a of this title." The new section 2a included the following:

Notwithstanding any other provision of law—

(i) This chapter shall not apply to and the [Commodity Futures Trading] Commission shall have no jurisdiction to designate a board of trade as a contract market for any transaction whereby any party to such transaction acquires any put, call, or other option on one or more securities (as defined in section 77b(1) or 78c(a)(10) of Title 15 on January 11, 1983), including any group or index of such securities, or any interest therein or based on the value thereof.

(ii) This chapter shall apply to and the Commission shall have exclusive jurisdiction with respect to accounts, agreements ... and transactions involving, and may designate a board of trade as a contract market in, contracts of sale (or options on such contracts) for future delivery of a group or index of securities (or any interest therein or based upon the value thereof).

The new section continues with the procedure for joint designation of contract markets for stock index futures.

Simultaneously, Congress amended the jurisdictional statutes concerning the SEC in both the 1933 and 1934 acts so that "security" would also include the following:

Any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof).

The 1982 amendments to the jurisdictional statutes of the respective agencies made it clear that "stock index futures" are "commodities" while "stock index options" are "securities." Following the congressional ratification of the agencies' jurisdictional treaty, each agency tentatively allowed trading in these radically different forms of investment.

The Kansas City Board of Trade had presented a proposal to the CFTC in June 1979 for the trading of futures on its "Value Line Index," a group of 1,700 stocks. Architzel & Connolly, *Delivery on Futures Contracts as a Legal Requirement*, 36 Bus.Law. 935, 935 n. 1 (1981). The Chicago Mercantile Exchange had submitted a similar proposal to the CFTC in February 1980 based on Standard and Poor's index of 500 stocks. *Id.* The CFTC granted final approval of trading on such stock index futures in February 1982.

Meanwhile, the SEC approved trading in broad-based "stock index options." Recently, the SEC tentatively approved trading of options on narrow-based stock indices, ones with stocks of a limited industry group such as the "Computer Tech Index," and the "Oil and Gas Index." *Phase-In Program for Options on Narrow-Based Stock Indices*, [1983–84 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 83–415 (Exchange Act Release No. 20076 August 12, 1983).

When Mr. Mallen authorized Mr. Spanos to trade the K.C. Value Line and the Standard & Poor 500 index, Mallen engaged in a form of speculation made possible only by the expansion of the regulatory jurisdiction of the CFTC in 1974 and the recognition of the jurisdictional border between the CFTC and the SEC in 1982. His individual purchases and sales of "stock index futures" were clearly "commodities" regulated exclusively by the CFTC. The account in which those "commodities" were traded was also a "commodity" under the exclusive jurisdiction of the CFTC, regardless whether it was managed by Mr. Mallen or by his broker.

Having determined that both the stock index futures and the account in which they were traded were subject to the exclusive regulatory jurisdiction of the CFTC, the court now turns to the question of its jurisdiction to adjudicate the dispute concerning those "commodities." Some courts have held that the jurisdictional provisos and the savings clause in the 1974 amendments to the Commodity Exchange Act created a distinction between agency jurisdiction and court jurisdiction. *See, e.g., Mullis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 492 F.Supp. 1345 (D.Nev. 1980). Another judge in this district, citing the *Mullis* case with favor, held in 1980 that the grant of exclusive jurisdiction to the CFTC to regulate commodity transactions did not preclude judicial application of the federal securities statutes to those transactions. *Westlake v. Abrams,* 504 F.Supp. 337 (N.D.Ga.1980). In that opinion, Judge Moye allowed the purchaser of two commodity options futures to bring suit against his broker under the 1933 and 1934 securities acts, but not under the SEC's regulations interpreting those acts. In a subsequent case, Judge Forrester allowed an investor to proceed against a brokerage firm for fraud concerning an account with mixed securities and commodities transactions under the securities acts as well as the regulations promulgated thereunder. *Taylor v. Bear Stearns & Co.,* 572 F.Supp. 667 (N.D.Ga.1983). This court finds that the legislative history of the savings clause does not support either result.

The legislative history of the 1974 amendments to the Commodity Exchange Act is set out in detail in two law review articles. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy,* 29 Vand.L.Rev. 1 (1976) [hereinafter cited as Johnson]; Van Wart, *Preemption and the Commodity Exchange Act,* 58 Chi.-Kent L.Rev. 657 (1982) [hereinafter cited as Van Wart]. The legislative history of the 1974 amendments is also discussed at length in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

Each of the following clauses in section 2 of the Commodity Exchange Act was added in succession to clarify the prior clause, but instead the clauses created a jurisdictional controversy:

*Provided,* That the [CFTC] shall have exclusive jurisdiction with respect to [commodity futures contracts] ...

*And provided further,* That except as hereinabove provided, nothing contained in this section shall

(i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or any State or

(ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2. [Spacing between the clauses supplied by the court.]

The primary object of the amendments to the Commodity Exchange Act was to create a new, powerful federal regulatory agency to deal with scandals in the sale of commodity futures. The congressional hearings focused on the need for sole regulatory power of commodities to be placed in one federal agency, unlike the regulation of securities which is shared by a federal agency and state agencies. There was testimony that some states were already experimenting with commodities regulation in the wake of grain shortages and certain notorious abuses. *Van Wart* at 672–83. The states' regulatory efforts have been characterized as "eccentric." A. Bromberg & L. Lowenfels, *Securities Fraud and Commodities Fraud,* § 4.6(471) at p. 82.-385 (Supp.1975).

█ The grant of exclusive jurisdiction to the CFTC in the first clause quoted above was meant to ensure that federal preemption of regulatory authority was complete. *Johnson* at 17. This exclusive jurisdiction language would both displace incipient state regulation and warn other federal agencies, such as the Department of Commerce and Department of Interior, that they were also displaced by the new federal agency. *Johnson* at 19.

The second proviso resulted from the difficulty Congress faced in realigning power between the new federal agency and the SEC. Controversy over the division of regulatory turf between those two federal agencies continued until the jurisdictional accord was adopted in 1982. *Johnson* at 11–12.

The final clause quoted above, the savings clause for federal and state court jurisdiction, was added in response to several concerns voiced during the circulation of the proposed bill among legislative committees and between the two houses of Congress.

First, some legislators made clear their desire that pending investigations by the SEC of abuses not previously under the CFTC's jurisdiction and pending court proceedings should continue unabated. *Johnson* at 7; *Van Wart* at 689. The fear that the enactment of the amendment would affect pending proceedings proved well-founded. One court subsequently found that the SEC was stripped of standing to file suit based on violations uncovered in an investigation which was pending when the 1974 amendments were enacted. *SEC v. Univest, Inc.,* 405 F.Supp. 1057 (N.D.Ill. 1975). One state held that suits brought under securities laws for a commodities transaction were made moot, even if the suit was in the appeals process when the amendments were enacted. *See Clayton Brokerage Co. v. Mouer,* 531 S.W.2d 805 (Tex.1975); *State v. Monex Int'l, Ltd.,* 527 S.W.2d 804 (Tex.Civ.App.1975).

The chairman of the House Judiciary Committee, Representative Peter Rodino, also questioned whether the legislation, as proposed, would eliminate state court jurisdiction over commodities disputes as simple contract claims. *Johnson* at 34; *Van Wart* at 683; *Curran,* 456 U.S. at 406–407 n. 15, 102 S.Ct. at 1854 n. 15. Both Rodino

and Senator Talmadge, Chairman of the Senate Committee on Agriculture and Forestry, were concerned that the legislation might affect federal antitrust jurisdiction. *Van Wart* at 683–87.

Senator Hart had proposed that the amendments include a new remedy for individual investors. His version of the 1974 amendments would include specific authorization of civil actions by individuals for treble damages. *Curran,* 456 U.S. at 408, 102 S.Ct. at 1855 (chart comparing features of four proposed versions of the bill is attached as Appendix A to the dissenting opinion). Other proposals included upper and lower limits on amounts recoverable through civil court actions. Neither the treble damages remedy nor the limit on civil recovery was accepted. The Commodity Exchange Act was left with two unusual remedies, a reparations procedure to be pursued in the agency, 7 U.S.C. § 18, and an arbitration procedure to be pursued in the exchange, 7 U.S.C. § 7a(11). This left the legislation with no clear statement that civil actions for actual damages were still available. Senator Clark who had introduced one of the unsuccessful versions of the bill pointed out that the absence of any reference to civil actions in the bill and the exclusive jurisdiction language might inadvertently prohibit all court actions. *Curran,* 456 U.S. at 385, 102 S.Ct. at 1843.

The addition of the savings clause for federal and state court jurisdiction could have dealt with all of these concerns.

In *Curran,* the Supreme Court held that the savings clause was evidence that Congress intended to retain a private cause of action for investors under the commodities laws, a cause of action which had previously been accepted by lower federal courts, albeit under "erroneous" reasoning. In response to the uncertainty concerning investors' rights during the appeal of *Curran,* Congress belatedly added an express cause of action to the Commodity Exchange Act in 1982. 7 U.S.C. § 25.

■ After considering the legislative history of the 1974 amendments and the Supreme Court's treatment of that history,

this court finds that the savings clause was meant to protect pending SEC investigations and on-going court proceedings, to protect state court jurisdiction over the contracts claims which form the basis of a futures contract and federal court jurisdiction over antitrust claims, and to preserve private causes of action in federal courts under the commodities laws. To the extent to which *Westlake v. Abrams* and *Taylor v. Bear Stearns & Co.,* hold that the savings clause preserves a private cause of action under the federal securities statutes although the underlying transaction is clearly a "commodity" the court expressly declines to follow those decisions.

■ First, both *Westlake v. Abrams* and *Taylor v. Bear Stearns & Co.* begin by asking whether an "investment contract" could be extended under the test of *SEC v. W.J. Howey Co.,* to include the investment vehicles at issue, commodity futures options in *Westlake v. Abrams* and mixed transactions in both securities and commodity futures in a discretionary account in *Taylor v. Bear Stearns.* This analysis is challenging—the application of the *Howey* test may be the intellectual mainstay of many securities lawyers—but it is faulty. In focusing on the most general term in the SEC statute, this analysis ignores specific terms in the jurisdictional statutes of the SEC and the CFTC. It is a basic rule of construction, for complex regulatory legislation as well as simple legal documents, that the specific controls the general. Of course, this court unlike Judge Moye has the benefit of the 1982 refinements which finetuned the description of the specific investments which fall under each agencies' jurisdiction.

Second, both cases posit that Congress, in enacting the savings clause, intended to create judicial jurisdiction at odds with regulatory jurisdiction. That analysis of congressional intent, presented previously in *Mullis,* 492 F.Supp. 1345, is not consistent with the legislative history discussed above nor with the Supreme Court's treatment of the savings clause in *Curran.* This court holds that the savings clause was added

merely to clarify that the previous provisos on regulatory jurisdiction did not remove all jurisdiction from federal courts. As pointed out by the minority in *Curran*, the source of a litigant's rights is still the substantive provision of the act which he seeks to enforce. *See Curran*, 456 U.S. at 406, 102 S.Ct. at 1854.

Finally, the ultimate effect of the decisions in *Westlake v. Abrams* and *Taylor v. Bear Stearns & Co.* defeats the fundamental congressional design in revamping the Commodity Exchange Act in 1974 and granting exclusive jurisdiction to the new CFTC—to avoid a duplicative or contradictory regulatory structure. Russo and Lyon, *The Exclusive Jurisdiction of the Commodity Futures Trading Commission*, 6 Hofstra L.Rev. 57 (1977). Under the prior cases in this jurisdiction, individuals and corporations like the defendants in this case would be subject to regulation by the CFTC under the Commodity Exchange Act, subject to suit by the CFTC or by states in a *parens patriae* capacity under the Commodity Exchange Act, *see* 7 U.S.C. § 13a–2 (1978), subject to arbitration and reparations claims under the Commodity Exchange Act, but subject to suit by private investors under the securities acts without the interpretative regulations promulgated thereunder. Such defendants would be vulnerable to this last, unworkable lawsuit only in jurisdictions within the Fifth and Eleventh Circuits. If an investor sued in the alternative under the securities and commodities acts and regulations in any other jurisdiction, the securities counts would be dismissed due to those jurisdictions' stricter requirements for "commonality." The suit would proceed under the commodities counts. *See, e.g., Curran v. Merrill Lynch, Pierce, Fenner & Smith*, 622 F.2d 216 (6th Cir.1980) (The Court of Appeals affirmed the dismissal of claims under the securities acts before the Supreme Court considered whether a cause of action existed the commodities act). *See also Mordaunt v. Incomco*, 686 F.2d 815 (9th Cir.1982), *cert. denied*, — U.S. —, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985) (Court of Appeals dismissed securities claims). In contrast, in this jurisdiction, courts before *Curran* would dismiss the commodities claims but retain the securities claims. After the Supreme Court's decision in *Curran*, Judge Moye reinstated the commodities claims in the continuing *Westlake* litigation. *Westlake v. Abrams*, 565 F.Supp. 1330 (N.D.Ga.1983). *See also Westlake v. Abrams*, 575 F.Supp. 58 (N.D.Ga.1983). The case proceeded with both securities and commodities claims. Such judicial application of a securities statute to a commodity transaction would force careful commodity brokers to see that the investment vehicle is registered as if it were regulated by the SEC at the same time that the board of exchange is seeking approval as a contract market under actual regulation by the CFTC. This judicial creation of a dual system of regulatory compliance is antithetical to the congressional purpose in creating the CFTC.

This court holds that, due to the preclusive and preemptive operation of the federal commodities laws, this plaintiff has no claim under the federal or state securities laws. Accordingly, Counts 1 through 4 of his complaint are hereby DISMISSED.

The court is concerned that its disposition of the defendants' motion to dismiss affects its jurisdiction of the other counts. The court DIRECTS the parties to submit further legal memoranda within 30 days from the filing of this order discussing whether the court now has jurisdiction over Counts 5 through 7 and whether the exclusive application of federal commodities laws preempts state common law recovery as well.