[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 6, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-10107

_____

D. C. Case No. 00-02532-CV-JTC-1

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

ETS PAYPHONES, INC.,

Defendant,

CHARLES E. EDWARDS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 6, 2002)**

Before EDMONDSON, Chief Judge, HILL and LAY[*], Circuit Judges.

PER CURIAM:

_____

[*]Honorable Donald P. Lay, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

Charles E. Edwards appeals from the district court's grant of a preliminary injunction in favor of the Securities and Exchange Commission (SEC). The SEC alleged Edwards' company, ETS Payphones, Inc. (ETS), sold securities in violation of the registration and anti-fraud provisions of the federal securities laws. See 15 U.S.C. §§ 77e(a), 77e(c), 77q(a), 78j(b); 17 C.F.R. § 240.10b-5. The SEC alleged these securities involved "investment contracts" whereby investors purchased a pay telephone from Edwards only to lease it back to ETS for management in exchange for a fixed monthly fee. The court determined it had jurisdiction over the SEC's action and preliminarily enjoined Edwards from future violations of the securities laws. It also froze Edwards' assets in anticipation of possible future disgorgement. On appeal, Edwards urges that the transactions did not involve securities and that the SEC lacks subject matter jurisdiction. We agree.

## Facts

Edwards is the principal actor in several business entities relevant to this appeal. He is the founder and majority stockholder of ETS. He is a member of its board of directors and served as its chief executive officer for most of the time period relevant to this appeal. ETS was incorporated to provide management services, i.e. placement, advertising, maintenance, coin collecting, and accounting, for owners of pay telephones.

2

Edwards also founded Payphone Systems Acquisitions, Inc. (PSA). PSA was a wholly owned subsidiary of ETS. PSA purchased telephone equipment and locations, which it sold at wholesale to distributors. Edwards also is the principal owner of Twinleaf, Inc., a consulting company Edwards created to provide support services to ETS.

The SEC asserts Edwards used these entities collectively to engage in a single, larger venture involving the sale of securities, specifically investment contracts. An investor would purchase a pay telephone indirectly from PSA, subject to a provision whereby the purchaser had fifteen days to cancel the transaction. Then the purchaser would lease the phone "back" to ETS for management in exchange for a fixed monthly fee. If at any time the purchaser was not satisfied with the arrangement, it could require ETS to purchase the phone for a prearranged price. Alternatively, it could cancel the lease and repossess its telephone without penalty. The SEC characterizes these transactions collectively as a "unit" sufficient to constitute a security under federal law. There is no dispute that Edwards did not register these transactions with the SEC.[1]

---

[1] We note that Edwards conferred with SEC staff in Atlanta in 1995 concerning ETS's payphone program. Edwards and his lawyers provided documents and records to the SEC and met with an SEC attorney. At that time, the record shows the SEC attorney was told the marketing and leasing aspects of ETS's business would be separated to avoid any claim that the payphone business involved a security. The SEC took no action and did not contact Edwards until the year 2000 when ETS filed for bankruptcy and reorganization.

The immediate dispute arose when, in September 2000, ETS and PSA filed a voluntary petition for bankruptcy and reorganization. As a result, ETS stopped making lease payments to the telephone owners and ceased honoring the buyback guarantees. The SEC brought this action asserting Edwards engaged in widespread fraud. Specifically, the SEC alleges Edwards' business venture was actually a "massive Ponzi scheme." It argues Edwards did not operate a legitimate business but rather fleeced his investors by misrepresenting his company as profitable when it only survived because he constantly recruited new purchasers and used their capital to satisfy ETS's obligations. The SEC asserts Edwards sustained this fraud for over five years, raising more than $300 million from over 10,000 investors, with the full knowledge that eventually the stream of new investors would dry up and only he would profit while his investors lost everything.

To prevent this perceived injustice, the SEC's suit prayed for disgorgement of any profits Edwards may have made as a result of his business dealings. The merits of this suit, however, are not before the court. We only review the district court's grant of a preliminary injunction and freeze of Edwards' assets. Edwards asserts various grounds of error, including an absence of subject matter jurisdiction and abuse of discretion in granting the injunction and asset freeze. We hold the district court

lacked subject matter jurisdiction to entertain this action; under the circumstances, we need not consider the other issues.

## Jurisdiction

Edwards challenges the district court's subject matter jurisdiction to grant relief to the SEC, arguing the sale of pay telephones does not involve securities under federal law. Specifically, Edwards argues these transactions did not involve investment contracts. In order to defeat a jurisdictional attack on a preliminary injunction, the SEC must establish "a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1198 (11th Cir. 1999) (quoting Majd-Pour v. Georgiana Cmty. Hosp., Inc., 724 F.2d 901, 902 (11th Cir. 1984)). The Supreme Court has established a three part test for determining whether a particular financial interest constitutes an investment contract and, thus, a security. In SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946), it held that an investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." Thus, the Supreme Court has characterized a transaction as an investment contract if it involves (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits to be derived solely from the efforts of others. We

5

agree with the district court that an investment of money is apparent. We address the remaining requirements in turn.

**A. Common Enterprise**

As Edwards points out, there is disagreement among the circuits as to the requirements of the second prong of the Howey test. Most circuits that have considered the issue find it satisfied where a movant shows "horizontal commonality," that is the "pooling" of investors' funds as a result of which the individual investors share all the risks and benefits of the business enterprise. See, e.g., SEC v. Infinity Group Co., 212 F.3d 180, 188 (3d Cir. 2000).[2]

Edwards' asserts the test for a common enterprise in this circuit is not settled and urges the court to adopt horizontal commonality. Notwithstanding Edwards' argument, we believe we are bound by precedent to apply a different test for commonality, "broad vertical commonality." See SEC v. Unique Financial Concepts, Inc., 196 F.3d 1195, 1199-1200 (11th Cir. 1999); Eberhardt v. Waters, 901 F.2d 1578, 1580-81 (11th Cir. 1990); SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 478-79 (5th Cir. 1974). Broad vertical commonality, the easiest to satisfy of the

---

[2]See also SEC v. Banner Fund Int'l, 211 F.3d 602, 614-15 (D.C. Cir. 2000); SEC v. Life Partners, Inc., 87 F.3d 536, 543-45 (D.C. Cir. 1996); Teague v. Bakker, 35 F.3d 978, 986 n.8 (4th Cir. 1994); Wals v. Fox Hills Dev. Corp., 24 F.3d 1016, 1018-19 (7th Cir. 1994); Revak v. SEC Realty, 18 F.3d 81, 87-89 (2d Cir. 1994); Newmyer v. Philatelic Leasing, Ltd., 888 F.2d 385, 391-93 (6th Cir. 1989).

alternative tests, only requires a movant to show that the investors are dependent upon the expertise or efforts of the investment promoter for their returns. We need not explore the applicability of this prong to the present case, however, in light of our holding that the last prong, "expectation of profits," clearly is unsatisfied.

## B. Expectation of Profits Solely from the Efforts of Others

The SEC cannot show a reasonable probability of success on the merits because it cannot show that investors who contracted with ETS expected profits to be derived solely through the efforts of others.

The SEC argues "profits" must be understood in a general sense. It notes that, in United Housing Found. v. Forman, 421 U.S. 837 (1975), the Court stated that an investor is "'attracted solely by the prospects of a return' on his investment." Id. at 852 (quoting Howey, 328 U.S. at 300). The definition of profits, the SEC asserts, must be understood in terms of the nature of an investment. Here, ETS's investors purchased their telephones for the purpose of earning a return on the purchase price. Thus, the SEC urges, this should be enough to justify a finding of expectation of profits.

Although the simplicity of the SEC's proposed approach is naturally appealing, we must disagree. In Forman, the Court made clear that the word "profits" has a limited meaning under federal securities law. Profits, in that context, require either

7

a participation in earnings by the investor or capital appreciation. See id. at 852 ("By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . . ."). In this case, there is no dispute that capital appreciation is not at issue. Moreover, the fixed lease payments paid to owners of the telephones cannot be considered participation in earnings; owners were not looking for any profit in the sense that they would receive earnings from the company. The owners certainly had no intention to share in the concomitant risk that their participation in the company's earnings would occasionally require them to share company losses. Of course, the funds generated by the payphones helped ETS meet its obligations. But this does not justify characterization as participation in earnings. Because the investors received a fixed monthly sum, the actual earnings of their telephone, or ETS, were irrelevant. ETS alone shouldered the risk of its placement of the telephones and ETS alone depended upon the earnings of its business. Thus, only ETS could reap profits as that term is understood under the federal securities law.

Even in the event the investors' return could be considered profits, the final Howey prong cannot be satisfied because the investors did not expect profits to be derived solely from the efforts of others. The parties dispute the level of control over the telephones the investors retained under the leaseback agreements. See Albanese

8

v. Florida Nat'l Bank of Orlando, 823 F.2d 408, 410 (11th Cir. 1987) ("If the investor retains the ability to control the profitability of his investment, the agreement is no security."). The SEC asserts the investors desired their telephones to be passive investments; Edwards urges the investors' right to cancel the lease and repossess their telephones, or not contract with ETS at all for that matter, constitutes sufficient control under the Albanese standard. In our opinion, however, the determining factor is the fact that the investors were entitled to their lease payments under their contracts with ETS. Because their returns were contractually guaranteed, those returns were not derived from the efforts of Edwards or anyone else at ETS; rather, they were derived as the benefit of the investors' bargain under the contract.

Because the SEC cannot satisfy the requirements of the Howey test to prove the existence of a security, we hold the district court did not have subject matter jurisdiction under the federal securities laws. The decision of the district court issuing a preliminary injunction and asset freeze is REVERSED with directions to dismiss the SEC's complaint for lack of subject matter jurisdiction.

LAY, Circuit Judge, concurring:

I concur with the judgment set forth in the majority opinion. The SEC cannot carry its burden to prove that Edwards' lease program involved an expectation of profits to be derived solely from the efforts of others. Consequently, there is no investment contract under SEC v. W.J. Howey Co., 328 U.S. 293 (1946), and no subject matter jurisdiction.

I write separately, however, to state my disagreement with that portion of the opinion which reaffirms broad vertical commonality as the test for common enterprise in the Eleventh Circuit. For the reasons set forth below, I respectfully submit that horizontal commonality is the only valid test for a common enterprise. Moreover, the SEC cannot carry its burden to prove horizontal commonality, and therefore, subject matter jurisdiction also is absent on this basis.

Requiring proof of horizontal commonality is the only logical approach to understanding the concept of a common enterprise. In Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 622 F.2d 216 (6th Cir. 1980), the court set forth the widely accepted justification for this position. Proof of horizontal commonality is required because requiring only proof of broad vertical commonality makes Howey's third prong–expectation of profits to be derived from the efforts of others–superfluous. Curran, 622 F.2d at 221-24 (citing Milnarik v. M-S

10

Commodities, Inc., 457 F.2d 274, 275-77 (7th Cir.), cert. denied, 409 U.S. 887 (1972) (Stevens, J.)). "[N]owhere in Howey or later Supreme Court decisions is it intimated that ['common enterprise'] is somehow redundant of other elements of the definition of a security." Id. at 224 (quoting Berman v. Bache, Halsey, Stuart, Shields, Inc., 467 F.Supp. 311, 319 (S.D Ohio 1979)). Consequently, only a requirement of horizontal commonality is consistent with the Howey test for an investment contract.[1] Indeed, in its arguments in a case out of the First Circuit, the SEC concedes that this reasoning is correct and broad vertical commonality is an inappropriate test for Howey's common enterprise requirement. See Brief for Appellant Securities and Exchange Comm'n at 28 n.11, SEC v. SG Ltd., 265 F.3d 42 (1st Cir. 2001) (Nos. 01-1176, 01-1332) ("The Commission has also long taken the position that broad vertical commonality is not an appropriate test because it collapses the second prong of the Howey test (common enterprise) into the third prong (profits to come from the efforts of others).").

---

[1]The Sixth Circuit relied a great deal on the decision of the Seventh Circuit in Milnarik, 457 F.2d 274, written by then-Judge Stevens. The Curran court, following the reasoning of Milnarik, observed:

> [W]e believe that no horizontal common enterprise can exist unless there also exists between discretionary account customers themselves some relationship which ties the fortunes of each investor to the success of the overall venture. Thus in our view the finding of a vertical common enterprise based solely on the relationship between promoter and investor is inconsistent with Howey.

Curran, 622 F.2d at 223-24.

The SEC responds that analysis of the present case under a requirement of horizontal commonality is inappropriate, however, because this circuit requires only proof of broad vertical commonality under SEC v. Unique Financial Concepts, Inc., 196 F.3d 1195, 1199-1200 (11th Cir. 1999); Eberhardt v. Waters, 901 F.2d 1578, 1580-81 (11th Cir. 1990); and SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 478-79 (5th Cir. 1974). The majority opinion finds this argument controlling. With all due respect to the law of this circuit, which I am bound to follow as a visiting judge, I must respectfully disagree that this panel is bound by precedent to require only proof of broad vertical commonality.

To the extent the SEC relies on Unique Financial Concepts and Eberhardt, the SEC's argument is unpersuasive. In these cases, the respective panels relied on a prior panel opinion in Villeneuve v. Advanced Bus. Concepts Corp., 698 F.2d 1121 (11th Cir. 1983), for the proposition that the Eleventh Circuit adheres to the broad vertical commonality test. Such reliance is misplaced.[2] The Villeneuve panel decision was vacated in an en banc decision. 730 F.2d 1403, 1404 (11th Cir. 1984). The en banc court did not address that part of the panel opinion where the court adhered to the broad vertical commonality test and, thus, did not reinstate the panel's decision in that

[2]The district court in the present case likewise mistakenly relied on the Villeneuve panel decision.

12

respect. When the full circuit court vacates a panel decision and hears a case en banc, the panel opinion and judgment are totally vacated and, thus, have no precedential value in whole or in part. See 11th Cir. R. 26(k). The only binding authority is the decision of the en banc court and the opinion supporting that decision. Cf. United States v. Rice, 635 F.2d 409, 410 n.1 (5th Cir. 1981) (noting that a vacated panel decision "constitutes no precedent"). As such, Unique Financial Concepts[3] and Eberhardt, erroneously relying on the vacated panel decision in Villeneuve, offer no precedent for the proposition that the Eleventh Circuit requires only proof of broad vertical commonality.

The only question concerning the court's authority to require proof of horizontal commonality comes from Koscot, a case out of the Fifth Circuit, which arguably binds the court notwithstanding the intervening repudiation of the theory it espoused.[4] Koscot, however, is no longer good law and, therefore, we are not bound by it. See Smith v. GTE Corp., 236 F.3d 1292, 1303 n.11 (11th Cir. 2001) ("Subsequent panels are not bound by prior decisions where there has been a change

---

[3]It should be noted that, notwithstanding its purported reliance on broad vertical commonality, the Unique Financial Concepts court based its decision on the fact that the "investors' funds [were to] be pooled and apportioned proportionately by Appellants to each account." 196 F.3d at 1200. Thus, the court actually relied on the proofs necessary to show horizontal commonality.

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

13

in the controlling law as a result of a subsequent . . . Supreme Court decision . . . .").[5] This court has twice noted–prior to the overruled panel decision in Villeneuve–that it "has yet to decide whether Koscot and the line of cases following it conflict with Howey and [United Housing Found. Inc. v. Forman, 421 U.S. 837 (1975)]." Phillips v. Kaplus, 764 F.2d 807, 816 n.9 (11th Cir. 1985) (citing Villeneuve, 730 F.2d at 1404 n.2). I believe that Koscot does conflict with Howey, per the analysis above, and Forman.

In Forman, 421 U.S. at 852, the Supreme Court reiterated that an investment contract required "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." It also stated, however: "The focus of the [Securities] Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors." 421 U.S. at 849. Koscot's broad vertical commonality test, which would include within the purview of a common enterprise even relationships between independent individual "investors" and a single "promoter," is antithetical to the Forman Court's

_____

[5]In fact, in Long v. Schultz Cattle Co., Inc., 896 F.2d 85, 88 (5th Cir. 1990), the Fifth Circuit has indicated a willingness to review the vertical commonality test in an appropriate case.

14

notion that the federal securities laws focus on the protection of broader capital markets. Moreover, as discussed in the majority opinion, the <u>Forman</u> Court limited the definition of profits to capital appreciation or a participation in earnings. <u>See id.</u> at 852. These types of financial return are much more likely to be associated with participation in the broader capital markets where investors' funds are pooled in a single enterprise. In the present case, there was no pooling of money in a common venture; thus, it is my opinion that this case does not fit within <u>Forman</u>'s understanding of common enterprise.

When the horizontal commonality test is applied to these facts, it is clear that the SEC also cannot carry its burden to show a common enterprise under <u>Howey</u>. The SEC asserts horizontal commonality can be found in the fact that Edwards operated a "massive Ponzi scheme." I disagree. The typical Ponzi scheme involves a fraudulent business venture where early investors are paid off by funds obtained from later investors, rather than the business itself, with the intent of using that early "success" to entice further investment in the sham venture. <u>See</u> <u>Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.</u>, 267 F.3d 340, 343-44 n.1 (3d Cir. 2001) (citing Black's Law Dictionary 1180 (7th ed. 1999)). The fact that a fledgling business uses capital rather than earnings to pay debts, however, does not automatically indicate a Ponzi scheme. It is widely recognized in the commercial

15

world that new businesses often do not show a profit in their early years; the only way to pay debt frequently is through the recruitment of new capital. Thus, it is the nature of the business as a sham which is the crucial consideration. Here, the record indicates that ETS made a good faith effort to run a legitimate business. It dutifully managed the phones it leased for the duration of its existence and continues to do so today under its reorganization plan. At its height, it had offices in twenty-eight states and Mexico and employed 550 people. Neither fact indicates that ETS was a fraudulent enterprise, "[un]supported by any underlying business venture," see Bald Eagle Area Sch. Dist. v. Keystone Fin. Inc., 189 F.3d 321, 323 n.1 (3d Cir. 1999) (internal citation omitted), as the SEC would have us believe.

Apart from allegations of a Ponzi scheme, the SEC cannot show horizontal commonality on the facts presented. ETS entered into distinct contracts with each investor; it did not pool their funds. See Curran, 622 F.2d at 222 (finding a pooling of investors' interests essential to a finding of common enterprise). The success of one investor's contract had no direct[6] impact on the success of any other; the investors were not "inextricably intertwined." SEC v. SG Ltd., 265 F.3d 42, 52 (1st Cir. 2001);

_____

[6]The SEC argues all "investors" in ETS shared the risk that it would go bankrupt and become unable to make lease payments; thus, it argues they are all "intertwined." This argument should be rejected as casting far too broad a net, contrary to the Court's teaching in United Housing Found. v. Forman, 421 U.S. 837, 857 n.24 (1975) (stating that mere "risk of involvency . . . 'differ[s] vastly' from the kind of risk of 'fluctuating' value associated with securities investments") (internal citation omitted).

16

<u>Union Planters Nat'l Bank of Memphis v. Commercial Credit Bus. Loans, Inc.</u>, 651 F.2d 1174, 1183 (6th Cir. 1981).  The investors were entitled to a guaranteed lease payment; only ETS bore the risk of failure and it alone would have enjoyed the benefits had its business prospered.  Every indication is that there was no horizontal commonality inherent in Edwards' lease program.  Consequently, subject matter jurisdiction fails on this basis as well.